**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF HEALTH CARE PROFESSIONALS, NUHHCE, AFSCME, AFL-CIO,<br>*Petitioner*,<br><br>VERITAS HEALTH SERVICES, INC.,<br>*Intervenor*,<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br>*Respondent*. | No. 15-70920<br><br>NLRB No.<br>31-CA-029713 |

VERITAS HEALTH SERVICES, INC.,
DBA Chino Valley Medical Center,
                    *Petitioner*,

UNION OF HEALTH CARE
PROFESSIONALS; UNITED NURSES
ASSOCIATIONS OF CALIFORNIA,
          *Petitioners-Intervenors*,

v.

NATIONAL LABOR RELATIONS
BOARD,
                    *Respondent*.

No. 15-71045

NLRB No.
31-CA-029713

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD,<br><br>*Petitioner*,<br><br>v.<br><br>VERITAS HEALTH SERVICES, INC.,<br>*Respondent*,<br><br>UNION OF HEALTH CARE PROFESSIONALS; UNITED NURSES ASSOCIATIONS OF CALIFORNIA,<br>*Respondents-Intervenors*. | No. 15-71390<br><br>NLRB No.<br>31-CA-029713<br><br><br>OPINION |

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted December 7, 2016
Pasadena, California

Filed September 11, 2017

Before: Harry Pregerson, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Labor Law

The panel denied the Chino Valley Medical Center's petition for review of the National Labor Relations Board's order determining that Chino Valley committed unfair labor practices before and after a nurses union election in violation of the National Labor Relations Act ("NLRA"), except as to an incidental petitioning argument that the panel dismissed for lack of jurisdiction; enforced the Board's order; granted the United Nurses Associations of California/Union of Health Care Professionals, NUHHCE, AFSCME, AFL-CIO (the "Union")'s petition for review; and remanded for the Board to address rescission of Chino Valley's written policy during the compliance stage.

The panel held that Chino Valley's due process argument – that the administrative law judge allegedly exhibited anti-employer bias – was without merit. Because Chino Valley did not otherwise contest the vast majority of the Board's unfair labor practices findings, the panel summarily enforced the portions of the Board's order that Chino Valley opposed only on due process grounds.

The panel next considered Chino Valley's substantive challenges to two unfair labor practices. First, the panel held that substantial evidence supported the finding that Chino Valley committed an unfair labor practice in violation of Sections 8(a)(1) and (3) of the NLRA by firing Ronald

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Magsino for his union activity because the law and the record supported the finding that Magsino's firing was pretextual and that he was not a supervisor (where, generally, the NLRA protects the rights of employees but not supervisors). Second, the panel held that Chino Valley violated Section 8(a)(1) of the NLRA by serving subpoenas seeking information about confidential union activity protected by Section 7 of the NLRA, including communications with Union representatives and signed authorization cards.

The panel held that the *Noerr-Pennington* doctrine, which provides that concerted efforts to petition the government that would otherwise be illegal may nonetheless be protected by the First Amendment's Petition Clause where certain criteria were met, did not immunize Chino Valley from unfair labor practice liability.

The panel held that Chino Valley's unfair labor practices warranted the Board's remedy that Chino Valley schedule meetings of all its employees, during paid work time, so that the Board's Notice to Employees could be read to them with a Union representative present. Rejecting Chino Valley's challenges to the remedy, the panel held that nothing in the NLRA protected an employer from the embarrassment it might experience as a byproduct of the Board's remedy, and no authority required a more detailed analysis than the Board or administrative law judge provided in these cases.

The panel turned to the Union's petition challenging the portion of the administrative law judge's decision that declined to address whether Chino Valley's written policy should be rescinded. The panel granted the Union's petition and remanded to the Board for a resolution of that narrow issue at the compliance stage of the proceeding because due

process did not bar the relief the Union sought – rescission of the written policy.

## COUNSEL

Theodore Richard Scott (argued) and Elizabeth D. Parry, Littler Mendelson P.C., San Diego, California, for Interevenor/Petitioner/Cross-Respondent (Veritas).

Ryan Spillers (argued), Gilbert & Sackman, Los Angeles, California; Lisa C. Demidovich, United Nurses Associations of California/Union of Health Care Professionals, NUHHCE, AFSCME, AFL-CIO, San Dimas, California; for Petitioner-Intervenor/Cross-Respondent (UNAC).

Barbara Ann Sheehy (argued), Attorney; Jill A. Griffin, Supervisory Attorney; Linda Dreeben, Deputy Associate General Counsel; John H. Ferguson, Associate General Counsel; Jennifer Abruzzo, Deputy General Counsel; Richard F. Griffin, Jr., General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent (NLRB).

**OPINION**

NGUYEN, Circuit Judge:

After its nurses voted to unionize by almost a 2-to-1 margin in April 2010, Veritas Health Services, Inc., d/b/a Chino Valley Medical Center ("CVMC") refused to bargain and challenged the election on several unsuccessful grounds. *See Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1269–70 (D.C. Cir. 2012). CVMC now appeals the determination that it committed serious and widespread unfair labor practices before and after the Union election in violation of the National Labor Relations Act ("NLRA"). While CVMC makes a global due process argument and contests the scope of the National Labor Relations Board's remedial order, it challenges on the merits only two of the unfair labor practices—the discharge of a prominent union supporter and service of subpoenas seeking information about union activity. Because the Board's conclusions are supported by precedent and substantial evidence, we reject these arguments and enforce the Board's order.

In addition, United Nurses Associations of California/Union of Health Care Professionals, NUHHCE, AFSCME, AFL-CIO (the "Union") petitions for review so the Board may consider on remand an issue that the Administrative Law Judge ("ALJ") declined to address below: whether CVMC's written policy banning employees from communicating with the media should be rescinded as an unfair labor practice. Because the complaint alleged an oral ban to the same effect and CVMC fully litigated the issue below, we grant the Union's petition and remand for the Board to address the issue during the compliance stage of these proceedings.

## I. Background

The Board made extensive findings detailing CVMC's threats, coercion, and retaliation against its employees. We focus here on the two unfair labor practices that are the subject of CVMC's challenges on the merits.

### A.  CVMC's discharge of Magsino

Ronald Magsino worked for CVMC from January 2005 until CVMC discharged him on May 20, 2010—less than two months after the Union won its election and just ten days after CVMC's unsuccessful May 10 hearing challenging the election results.  The day Magsino was fired, human resources director Arti Dhuper told Magsino that he was being fired for violating the Health Insurance Portability and Accountability Act ("HIPAA") by giving the human resources department a patient's partially redacted medical records to defend himself in a disciplinary proceeding earlier that month.  That disciplinary proceeding arose from CVMC's allegation that Magsino had violated an internal policy to retake a patient's vital signs.  In telling Magsino that his discipline would not be overturned, Dhuper did not address (nor has CVMC ever refuted) Magsino's defense that CVMC had no policy requiring him to re-take the patient's vital signs.  The ALJ concluded, and the Board affirmed, that CVMC's invocation of HIPAA was a pretext for discharging Magsino because of his union activity, a finding that CVMC now challenges on appeal.

Magsino was a visible supporter of the Union; he talked to his fellow nurses, arranged meetings, and appeared in flyers distributed by the Union.  Shortly before the Union election, CVMC's chief medical officer James Lally showed Magsino one of the Union flyers that bore his picture and called Magsino a "movie star."  In one of several unfair labor

practices that CVMC engaged in, Lally told Magsino that he was seen on camera talking to a group of nurses during work hours and that doing so was a ground for termination. CVMC also engaged in other serious and widespread unfair labor practices, including unilaterally imposing, about a month after the Union election, a new tardiness policy that eliminated the seven-minute grace period that nurses had previously enjoyed when clocking into their shifts. On the morning of May 5—about a week before CVMC's unsuccessful hearing challenging the Union election— Magsino was disciplined for tardiness under this new policy, which was the first time he had ever been disciplined for clocking in within the seven-minute period.

Later on May 5, emergency room director Cheryl Gilliatt summoned Magsino and showed him a final written warning for unsatisfactory work performance. Gilliatt claimed that the California Department of Public Health ("DPH") had done a random audit and found that Magsino had not re-taken a patient's vital signs before releasing her from the emergency room a month earlier, on April 1. The final written warning listed the patient's medical record number and stated that not re-taking the patient's vital signs was a violation of CVMC's policy.

When Gilliatt showed him CVMC's patient reassessment policy, Magsino pointed out that the policy did not require re-taking a patient's vital signs. Gilliatt also showed Magsino unredacted patient records (nursing notes that he had prepared and an emergency room report) that contained the patient's name, date of birth, medical record number, medical condition, course of treatment, doctor's dictation about the visit, and transaction number. Magsino asked if he could leave to review the records in more detail. Gilliatt said he could view and print them and gave Magsino

the patient's name and medical record number on a piece of paper.

Magsino went to a nursing station where he accessed the same records, printed the emergency report, and then redacted the patient's name with a marker. To ensure the name could not be seen, he copied that redacted version, kept the copy, and destroyed the rest. Magsino then went to see Gilliatt with a colleague and again pointed out that CVMC's policy did not require re-taking vital signs. Gilliatt responded that she did not make the warning and that management simply asked her to give it to him.

After the meeting, Gilliatt found Magsino at the nursing station looking through materials and taking notes. She told him to stop preparing his disciplinary defense at work and to do his research at home. The next day, on May 6, Gilliatt gave Magsino a copy of CVMC's internal grievance procedure and again told him to review the medical record at home and then submit his dispute.

Following Gilliatt's advice, Magsino filed a grievance on May 12 with the human resources department to challenge his discipline. He explained that CVMC's policy did not require nurses to re-take vital signs, especially given that the treating doctor was aware of the patient's elevated blood pressure, reminded the patient to take her blood pressure medication, and approved her discharge from the emergency room less than an hour after she had been admitted for an unrelated condition (flank pain). Magsino supported his grievance with several documents, including a copy of the emergency room report that contained the same medical record and transaction numbers that Gilliatt had given him, with the patient's name redacted. In addition, Magsino attached a letter from the treating doctor, which included the same transaction number.

Magsino also provided two dozen testimonials from other doctors, emergency medical technicians, coworkers, and patients who praised his skills. These testimonials detailed the ways in which Magsino was an "outstanding nurse" whose diligence, knowledge, and compassion over the years had earned doctors' "complete confidence and support" as well as the admiration of his coworkers, several of whom he had mentored and inspired to become nurses themselves. Magsino's colleagues commended him for being a "team player" and a "great patient advocate" with such "excellent bedside manner" that patients complimented him to others. According to his coworkers, he was "one of the best nurses" at CVMC, "one of our greatest assets," and one who always went "above and beyond" his duties.

On May 14, chief nursing officer Linda Ruggio summoned Magsino to a meeting in her office with Gilliatt. Ruggio told Magsino that printing the patient's chart on May 5 was a HIPAA violation. Magsino explained that he had done so with Gilliatt's permission to defend himself in the disciplinary proceeding and that Gilliatt had disclosed to him even more information—all unredacted—in disciplining him. Ruggio then accused Magsino of committing additional HIPAA violations by copying the partially redacted record (to hide the patient's name), submitting it with his grievance, and retaining a copy in his backpack.

Around the same time, another nurse and Union supporter, Yesenia DeSantiago, received a final written warning for the same two violations that CVMC claims justify Magsino's firing: (1) not re-taking a patient's vital signs; and (2) accessing and printing that patient's information in defending against the ensuing disciplinary proceeding. As with Magsino, CVMC was unmoved by DeSantiago's explanation that Gilliatt had permitted her to

use the patient information and that she could not have defended herself without it. However, DeSantiago was told that she would not be fired because the violations were "for two different things," given that one was for treatment of a patient and the other was a violation of HIPAA. In contrast, CVMC's termination notice to Magsino characterized these two violations—as well as his discipline under CVMC's illegal tardiness policy—as "similar," thereby creating the appearance that he had engaged in multiple "similar" violations.[1]

While CVMC aggressively pursued alleged HIPAA violations among its union supporters, no manager was disciplined for engaging in similar acts. For example, as part of the disciplinary process, Gilliatt and the treating doctor accessed and internally distributed the same patient's information. And, in contrast with the redacted documents Magsino submitted to the human resources department, Gilliatt disseminated *unredacted* records. Yet, neither Gilliatt nor the treating doctor were investigated or disciplined.

In addition, four other employees received only verbal or written warnings for disseminating patient information externally. CVMC gave a verbal warning to three employees who faxed several types of patient information to external recipients, including medical diagnoses, social

---

[1] CVMC's mischaracterization of the tardiness, vital signs, and HIPAA infractions as "similar" violations appears to have been an effort to elevate Magsino into the highest level of CVMC's discipline policy, for which termination is recommended. This highest level is reserved for the most egregious HIPAA violations, namely, "an unacceptable level of previous violations and accompanying verbal disclosure of patient information regarding treatment and status." Obviously, that description does not fit Magsino's conduct.

security numbers, and financial information. Another employee received only a written warning for repeatedly sharing patient information externally, including leaving a financial chart in the bathroom where it was found by a customer.

On May 19, the day before Magsino's termination, CVMC's own internal investigation concluded that Magsino and DeSantiago should receive only retraining and a written warning. CVMC's investigation concluded that Magsino committed "no breach when [he] accessed the computer to review the electronic record," but that his "unauthorized" printing, copying, removal from the hospital, and inclusion in his grievance of the partially redacted patient records was a HIPAA breach.

On May 20, CVMC fired Magsino without waiting for the results of the DPH investigation (which CVMC itself had initiated) into whether any HIPAA breach had, in fact, occurred. Seven days later, DPH concluded that "no breach actually occurred." DPH found that CVMC's claim to the contrary was "unsubstantiated" because "no information was shared." Instead, Magsino and DeSantiago's use of patient information was simply "for personal use in defending themselves."

## B. Magsino's status as an employee

In the proceedings below, CVMC sought to excuse its firing of Magsino on the ground that his occasional shifts as a relief charge nurse qualified him as a supervisor under the NLRA, thereby depriving him of its protections. The Board rejected this affirmative defense.

As the ALJ noted, CVMC and the Union had stipulated in 2008 and in 2010 to the supervisory status of certain

named charge nurses, none of whom are Magsino.  The ALJ also refused to credit Gilliatt's testimony in response to several leading questions about Magsino's supervisor status, citing her demeanor and evasive answers.  Gilliatt testified that a charge nurse assigns Registered Nurses ("RNs") to different rooms in the emergency department based on an "assessment" of the RNs' "experience," "skill set," and "acuity of the patient."  Gilliatt testified that, as a charge nurse, she had authority to assign work and that Magsino's "duties" and "authority" as a relief charge nurse were "no different" from hers.  However, she also admitted that relief charge nurse shifts were assigned only when the regular charge nurse was unavailable (which, as we explain later, makes a big difference when determining supervisor status).

After rejecting CVMC's argument that Magsino engaged in supervisory functions as a relief charge nurse, the ALJ did not reach the issue of whether Magsino's work as a relief charge nurse was a regular and substantial portion of his time.  However, testimony by Magsino and another employee, Marlene Bacani, both of whom the ALJ found credible, established that Magsino's shifts as a relief charge nurse decreased in 2010 from ten shifts in February to six shifts in April to only three shifts in May.[2]

---

[2] Bacani testified that Magsino worked ten shifts as a charge nurse in February 2010.  Contrary to CVMC's contention, Magsino's testimony does not contradict this statement, as he could not recall with certainty the number of shifts he worked in February 2010.  Furthermore, CVMC's counsel conceded during Magsino's cross examination that the number of shifts would be better reflected by documents (to which CVMC has not directed this court).

## C. CVMC's subpoenas seeking information about union activity

CVMC also challenges on appeal the finding that CVMC committed an unfair labor practice by serving subpoenas seeking information protected by the NLRA.

Around May 2010 and while CVMC was preparing to litigate its objections to the Union election, CVMC served subpoenas on its nurses and the Union demanding, among other things, the production of all communications with union representatives, all documents relating to union membership card solicitation, and all membership cards signed by RNs. The subpoenas advised that nurses who had never been employed as "Charge Nurses" could produce the documents to a hearing officer at "an *in camera* inspection, whereupon only non-privileged documents that are relevant to [CVMC's] Objections are provided to [CVMC]."

At the hearing on CVMC's objections to the Union election, the ALJ revoked portions of these subpoenas and redacted some documents to prevent disclosure of the names of nurses who had attended Union meetings or otherwise supported the Union. *See Veritas*, 671 F.3d at 1274. The ALJ reasoned that this information was protected by the NLRA and was not relevant to CVMC's election objection. The D.C. Circuit affirmed these rulings in an opinion rejecting CVMC's several election objections. *Veritas*, 671 F.3d at 1274.

## D. Proceedings before the ALJ and the Board

In a thorough decision, the ALJ found that CVMC committed several unfair labor practices by engaging in threats, coercion, and retaliation, including the conduct described above. The ALJ ordered CVMC to cease and

desist from its illegal conduct, which included CVMC's oral ban on employees communicating with the media. The Union urged the ALJ to also rescind CVMC's written policy to the same effect, which CVMC itself had introduced and authenticated. However, the ALJ declined to do so because, while the oral ban was alleged as an unfair labor practice in the complaint, the written policy was not and it was not pursued by the General Counsel.

To remedy CVMC's serious and widespread unfair labor practices, the ALJ ordered that, among other things, CVMC schedule meetings with all its employees during paid work time so that, with a Union representative present, the Board's Notice to Employees could be read to them by management or a Board agent. The Board affirmed the ALJ's rulings, findings, and conclusions, with a couple of modifications to the ordered remedy that are not at issue here. CVMC and the Union filed petitions for review, and the Board filed a cross-application for enforcement.

## II. Standard of Review

A court must uphold a Board decision "when substantial evidence supports its findings of fact and when the agency applies the law correctly." *Sever v. NLRB*, 231 F.3d 1156, 1164 (9th Cir. 2000). The Board's findings of fact are conclusive if supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951). As to factual findings, a court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera*, 340 U.S. at 488.

The Board's credibility findings are entitled to "special deference." *Sever*, 231 F.3d at 1164. A court will not reverse the Board's credibility determinations unless they are "inherently incredible or patently unreasonable." *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1006 (9th Cir. 1995).

The Board is vested with "broad discretion to devise remedies that effectuate the policies of the Act." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898–99 (1984). We therefore review the Board's remedial order only for a "clear abuse of discretion," *Cal. Pac. Med. Ctr. v. NLRB*, 87 F.3d 304, 308 (9th Cir. 1996), meaning that the Board's remedial order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943).

We defer to any "reasonably defensible" interpretation of the NLRA by the Board. *Retlaw*, 53 F.3d at 1005. Where the NLRA is ambiguous such that the Board must choose between conflicting reasonable interpretations, courts "must respect the judgment of the agency empowered to apply the law." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398–99 (1996).

## III. Discussion

### A. CVMC's meritless due process argument does not preclude summary enforcement of the Board's order

CVMC argues that it was denied due process because the ALJ allegedly exhibited anti-employer bias. While CVMC cites the voluminous record, it makes no substantive argument and omits any legal authority suggesting how the

ALJ erred.[3]    Well-established law, including controlling
Supreme Court precedent, provides that no due process
violation or bias can be inferred from the conduct challenged
here: adverse credibility determinations of an employer's
witnesses,[4] evidentiary rulings unfavorable to an employer,[5]
questioning of an employer's witnesses,[6] and alleged
expressions of impatience or anger.[7]    Therefore, even if
CVMC's characterization of the ALJ's conduct were correct
(which it is not), CVMC has identified nothing "so extreme
as to display clear inability to render fair judgment." *Liteky
v. United States*, 510 U.S. 540, 551 (1994).

Because CVMC's due process challenge is without merit
and CVMC does not otherwise contest the vast majority of
the Board's unfair labor practices findings, we summarily
enforce the portions of the Board's order that CVMC
opposes only on due process grounds. *See Diamond Walnut
Growers, Inc. v. NLRB*, 53 F.3d 1085, 1087 (9th Cir. 1995);
*NLRB v. Sav-On-Drugs, Inc.*, 709 F.2d 536, 542 (9th Cir.
1983).    We next consider CVMC's substantive challenges to
two unfair labor practices in light of the Board's findings that
CVMC engaged in other unfair labor practices.    *See*

---

[3] The two cases relied upon by CVMC actually held that the
challenged administrative hearings "comport[ed] with the requirements
of due process." *Hannah v. Larche*, 363 U.S. 420, 451 (1960); *see also
Withrow v. Larkin*, 421 U.S. 35, 58 (1975).

[4] *NLRB v. Pittsburgh S.S. Co.,* 337 U.S. 656, 659–60 (1949).

[5] *NLRB v. Phaostron Instrument & Elec. Co.*, 344 F.2d 855, 859 (9th
Cir. 1965); *Hedison Mfg. Co. v. NLRB,* 643 F.2d 32, 35 (1st Cir. 1981).

[6] *NLRB v. Cent. Press Cal.*, 527 F.2d 1156, 1157 (9th Cir. 1975).

[7] *Liteky v. United States*, 510 U.S. 540, 556 (1994).

*Torrington Extend-A-Care Emp. Ass'n v. NLRB*, 17 F.3d 580, 590 (2d Cir. 1994).

## B.  CVMC violated Section 8(a)(1) and (3) by firing Magsino

Substantial evidence supports the finding that CVMC committed an unfair labor practice in violation of Section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1) and (3), by firing Magsino for his union activity.  An employer violates Section 8(a)(1) and (3) by, among other things, discharging or disciplining an employee for his or others' protected activity, such as supporting efforts to unionize. *NLRB v. HTH Corp.*, 693 F.3d 1051, 1059–60 (9th Cir. 2012); *see* 29 U.S.C. § 157.  To determine an employer's motivation for taking an adverse employment action, the Board uses the well-established test set forth in *Wright Line*, 251 N.L.R.B. 1083 (1980).  *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399–403 (1983), *overruled on other grounds by Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276–78 (1994).

Under *Wright Line*, the General Counsel must make a showing "sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Healthcare Emps. Union, Local 399, v. NLRB*, 463 F.3d 909, 919 (9th Cir. 2006) (quoting *Wright Line*, 251 N.L.R.B. at 1089).  The Board may infer a discriminatory motive from direct or circumstantial evidence. *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir. 1997).  After the General Counsel makes this showing, "the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct." *Healthcare Emps. Union*, 463 F.3d at 919 (quoting *Wright Line*, 251 N.L.R.B. at 1089).  An employer cannot prove this

affirmative defense where its "asserted reasons for a discharge are found to be pretextual." *In re Stevens Creek Chrysler Jeep Dodge, Inc.*, 357 N.L.R.B. 633, 637 (2011).

### i. The General Counsel made a strong showing of improper motive

An unlawful motive may be established in several ways, including evidence of "the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Healthcare Emps. Union*, 463 F.3d at 920–22 (internal quotation marks omitted).      All those indicia of discriminatory motive are present here.  In addition to calling out Magsino as a Union "movie star," CVMC expressed its anti-union animus through several unfair labor practices, including a retaliatory tardiness policy under which Magsino was disciplined.  CVMC also fired Magsino less than two months after the Union won its election and less than two weeks after CVMC's unsuccessful hearing challenging the election results.  Accordingly, substantial evidence supports the finding that union activity was a motivating factor in Magsino's discharge.

### ii. Substantial evidence supports the finding that CVMC invoked HIPAA as a pretext

CVMC's termination of Magsino has all the hallmarks of a pretextual firing, including deviations from its internal practice, disparate treatment, and ex post facto justifications. *See Healthcare Emps. Union*, 463 F.3d at 922–23; *Lucky Cab Co.*, 360 N.L.R.B. 271, 274 (2014).  As summarized above, CVMC expressly authorized Magsino to engage in the conduct for which CVMC claims it fired him.  Seven other individuals either were not disciplined or received lesser discipline for engaging in acts similar to or more

egregious than those for which CVMC claims it fired Magsino. In responding to Magsino's purported HIPAA violation, CVMC failed to follow its own internal policies and ultimately fired him the day after its own internal investigation recommended that he receive only retraining and a written warning. CVMC also fired Magsino even though a DPH investigation concluded that no HIPAA breach actually occurred.

Any one of these factual findings alone would be enough to establish pretext, and cumulatively they provide overwhelming evidence that CVMC acted with a discriminatory motive in firing Magsino. CVMC nonetheless argues that it could have discharged Magsino because he violated CVMC's internal policies or HIPAA and that, in any event, CVMC had a good-faith belief that he had done so. The Board did not err in concluding that CVMC failed to meet its burden under any of these theories. We address each of CVMC's arguments in turn.

CVMC invokes an affirmative defense that, even if Magsino did not violate HIPAA, he violated CVMC's internal policies by not re-taking a patient's vital signs and by using that patient's medical records in the disciplinary proceeding. Substantial evidence supports the Board's rejection of this ex post facto justification.

At the outset, we note that CVMC's assertion that it could have fired Magsino for not re-taking vital signs has no record support. CVMC identifies no evidence that it had an internal policy requiring Magsino to do so, that he actually violated the policy, or that CVMC could have lawfully fired him as a result. And, unlike in the case relied upon by CVMC, *Butler-Johnson Corp. v. NLRB*, 608 F.2d 1303, 1308 (9th Cir. 1979), the ALJ here made factual findings that CVMC acted with an unlawful motive.

Nor is CVMC correct that Magsino exceeded the scope of his authorization by using the patient's information to defend himself during the disciplinary proceeding. Even assuming CVMC could lawfully restrict its employees' use of patient information in such a manner, the evidence shows that Gilliatt *twice* authorized Magsino to use the patient file to defend himself, including engaging in the conduct for which CVMC ostensibly fired him. Magsino's credited testimony was that, in addition to telling him on May 5 that he could view and print medical records, Gilliatt told him on May 6 "to review the . . . medical record and the dispute and submit it" and that he could review the medical record "at home"—a review which obviously required printing, copying, and removing the record from the hospital. In arguing to the contrary, CVMC simply ignores this testimony, misrepresents the ALJ's findings about it, and relies on testimony by Gilliatt that the ALJ expressly found not credible. But the ALJ's credibility determinations are entitled to "special deference," and CVMC's misrepresentations of the record significantly undermine its own argument on appeal.[8] *Sever*, 231 F.3d at 1164.

CVMC also fleetingly alludes to other internal policies and California law that it suggests Magsino violated by using patient information to defend himself in the disciplinary proceeding. *See* Cal. Health & Safety Code § 1280.15; Cal. Code Regs. tit. 22 § 70707. This perfunctory argument is inadequately briefed and therefore waived. *James River Ins.*

---

[8] For example, CVMC's reply brief asserts that "the ALJ made no finding that permission was given to remove patient records." Not only is that untrue, CVMC in fact challenged below the very finding that it now claims the ALJ did not make, namely, that "Gilliatt authorized Magsino to print a copy of [the] patient's emergency room report and take it home with him."

*Co. v. Hebert Schenk*, P.C., 523 F.3d 915, 920 n.1 (9th Cir. 2008). But even on the merits, CVMC points to no language in these internal policies and California law that support its position. Nor is there any basis to reverse the ALJ's finding that CVMC's internal policies "would objectively lead [Magsino] to believe he was allowed to access the medical records."

CVMC alternatively argues, without authority, that Magsino's use of patient information in a disciplinary proceeding falls outside the protections of HIPAA's internal grievance procedure. CVMC's interpretation is contrary to the plain language of HIPAA's internal grievance procedure regulations,[9] which permits "disclosure to an employee and/or employee representative, for example when the employee needs protected health information to demonstrate that the employer's allegations of improper conduct are untrue."[10] More importantly, CVMC's reading of HIPAA would yield the absurd result of turning a disciplinary proceeding into a Kafkaesque ordeal whereby an employee cannot see or submit the very information by which she seeks to challenge her discipline. Nor can CVMC's position be squared with the findings by DPH—the state agency that investigated the supposed HIPAA violation—that "no breach actually occurred" and that CVMC's claim to the

---

[9] 45 C.F.R. § 164.506(c)(1) ("A covered entity may use or disclose protected health information for its own treatment, payment, or health care operations"); 45 C.F.R. § 164.501(6)(iii) ("Health care operations means any of the following activities of the covered entity to the extent that the activities are related to covered functions: . . . Resolution of internal grievances").

[10] Standards for Privacy of Individually Identifiable Health Information; Final Rule, 45 C.F.R. Parts 160 and 164, Section 164.501—Definitions, 65 Fed. Reg. 82462, 82491 (Dec. 28, 2000).

contrary was "unsubstantiated" because the patient information was used to defend against a disciplinary charge. CVMC's argument also is beside the point, as the Board's decision did not turn on whether or not Magsino violated HIPAA but rather on the ample evidence that CVMC invoked HIPAA as a pretext for firing him.

CVMC next argues that Magsino is not similarly situated to the seven individuals at CVMC who either were not disciplined or received lesser discipline for engaging in similar or more egregious HIPAA-related acts. Such disparate treatment is enough to establish pretext. *See Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 468, 470 (9th Cir. 1966) (upholding Board's determination that discharge for insubordination was pretextual where employer "refused to discharge" another employee also accused of insubordination); *Lucky Cab*, 360 N.L.R.B. at 274 (discriminatory motive shown because "other drivers were not discharged for the same or similar infractions as those committed by" employees).

Gilliatt and the treating doctor both internally shared the same patient's medical information as part of the same disciplinary proceeding for which Magsino was fired. CVMC justifies these managers' lack of discipline by invoking a HIPAA regulation that permits the use of patient information for the purpose of quality assessment and to resolve internal grievances. *See* 45 C.F.R. §§ 164.501(1), 164.501(6)(iii). But those same purposes were also served by Magsino's use of the patient's information to defend himself in the disciplinary proceeding. Indeed, it is hard to imagine how CVMC could have assessed the quality of Magsino's patient care without the information Magsino submitted. CVMC also suggests that these two managers acted with authorization that Magsino lacked, but fails to cite

any evidence to challenge the ALJ's contrary conclusion. In fact, it was Magsino who obtained the authorization that these managers lacked.

CVMC also fails to explain how Magsino is not similarly situated to another nurse, DeSantiago, who received a final written warning for the *same* purported violations around the same time that Magsino did. CVMC argues that Magsino's conduct was more egregious because it spanned the course of a week and included submitting a partially redacted patient record to the human resources department. These are not meaningful distinctions because Magsino was well within his rights to do so and, regardless, CVMC expressly authorized Magsino's conduct. Nor is CVMC correct that a finding of pretext is belied by its decision to fire one Union "star" (Magsino) but not another union supporter (DeSantiago).[11] An employer cannot camouflage its anti-union animus by doling out gradations of punishment among union supporters, as the NLRA bars an employer from discriminating against every single one of them.

Equally unavailing is CVMC's argument that Magsino is not similarly situated to four other nurses who received less severe discipline for similar or more egregious disseminations of patient medical information internally and externally. CVMC's attempt to explain Magsino's conduct as somehow more "purposeful" than the other employees' conduct is without factual support. In fact, as the ALJ found, Magsino redacted and destroyed documents to maintain confidentiality. And CVMC's own internal investigation

---

[11] The case cited by CVMC does not stand for that proposition. *See Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 506 (7th Cir. 2003) (faulting Board for "not identify[ing] a single employee who . . . was treated differently than" the terminated union supporter).

concluded that Magsino "believe[d] that he was accessing [the records] as part of his job" and recommended that he merely be re-trained.

CVMC also argues that Magsino is not similarly situated to any of the abovementioned individuals because he engaged in a "series" of HIPAA violations, which CVMC calculates by dividing into separate "acts" Magsino's use of one patient's information. Yet the same method could be used to slice and dice any of the other individuals' conduct. For example, Gilliatt's use of patient information in Magsino's disciplinary meeting could be carved into several discrete "acts," one for each time she accessed, copied, printed, carried, and handed to Magsino the nursing notes, emergency room report, and medical record number. Yet, CVMC did not even investigate Gilliatt, much less discipline her.

Finally, despite initiating the DPH investigation, CVMC now disavows its finding that "no breach actually occurred" on the ground that DPH lacked jurisdiction to determine if Magsino breached HIPAA. CVMC cites testimony to that effect by its chief compliance officer, Suzanne Richards. But this self-serving testimony is no substitute for legal authority delineating an agency's jurisdiction. Furthermore, the ALJ found that she was not credible for several reasons, including her inconsistent testimony attempting to reconcile Magsino's discharge with the lack of discipline for Gilliatt.

We therefore conclude that substantial evidence supports the finding that CVMC's discharge of Magsino was pretextual and an unlawful labor practice.

### iii. CVMC failed to prove that Magsino was a supervisor

Subject to certain exceptions,[12] the NLRA protects the rights of employees—but not supervisors—to unionize, bargain collectively, and engage in other concerted activity. 29 U.S.C. § 157; 29 U.S.C. § 152(3).  Seizing on this provision, CVMC argues that it was permissible to discharge Magsino for his support of the Union because CVMC made him a supervisor shortly before firing him, thereby leaving him unprotected by the NLRA.  We disagree.

As to the law, CVMC cannot retroactively strip Magsino of the NLRA's protections by promoting him to a supervisor position and then firing him for past protected activity done as an employee.  And as to the facts, CVMC has failed to show that Magsino was a supervisor, a burden that it bore as the party asserting supervisory status.  *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711–13 (2001); *Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 694 (2006).  Therefore, there is no basis to reverse the Board's determination that Magsino was not a supervisor, which in any event is entitled to "particularly strong" deference.  *N. Mont. Health Care Ctr. v. NLRB*, 178 F.3d 1089, 1094 (9th Cir. 1999).

---

[12] *See, e.g., Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 383 n.4 (1986) ("Even though supervisors are not covered by the Act, a discharge [of a supervisor] may constitute a § 8(a)(1) unfair labor practice if it infringes on the § 7 rights of the employer's nonsupervisory employees.").

### a. CVMC cannot retroactively strip Magsino of the NLRA's protection

It is undisputed that Magsino was not a supervisor when he worked as a relief charge nurse before March 15, 2010.[13] CVMC nonetheless argues, without authority, that Magsino's status as a non-supervisory employee prior to mid-March is irrelevant because CVMC made him a supervisor two months later on May 20, 2010, when it fired him.

A similar argument was rejected in *United Exposition Service Co. v. NLRB*, which enforced the Board's order requiring backpay and reinstatement for a "temporary supervisor" whom the employer punished for participating in a strike while he was an employee. 945 F.2d 1057, 1060–61 (8th Cir. 1991). There, the parties had stipulated that the punished individual was a statutory supervisor when he performed out-of-town jobs. *Id.* at 1060. In rejecting the employer's argument that this supervisory status removed him from the NLRA's protection, the court reasoned that the employer "retaliated against [him] for his activities as an employee, not as a supervisor." *Id.* Because he was an employee when he "participated in the protected activities," his temporary supervisory status "does not vitiate his status as a protected employee." *Id.* at 1061. That same logic underpins our conclusion here that an employer cannot retroactively strip an employee of the NLRA's protections simply by making him a supervisor.

---

[13] CVMC signed a stipulation with the Union ten days earlier on March 5, 2010, stating that Gilliatt and five named charge nurses were individuals who met the requirements for a supervisor under 29 U.S.C. § 152(11). Magsino, who worked ten shifts as a relief charge nurse in February 2010, was not listed as one of those supervisors.

Our holding is also compelled by the Supreme Court's instruction that the NLRA must be construed consistent with its remedial purposes of encouraging collective bargaining and protecting "the right of employees to engage in concerted activities for their own benefit." *NLRB v. Lion Oil Co.*, 352 U.S. 282, 289 (1957); *see also Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 284 (1956). Permitting an employer to retaliate against employees who engage in protected activity by simply promoting them before firing them would eviscerate the protections the NLRA affords to employees and thwart their collective bargaining efforts.

### b. CVMC failed to prove Magsino was a supervisor

Even if CVMC were correct that a supervisor can be fired for past protected activity engaged in as an employee, substantial evidence supports the conclusion that CVMC failed to prove that Magsino was a supervisor at the time he was fired. To meet its burden, CVMC had to show, among other things, that Magsino both: (1) performed "supervisory functions"; and (2) spent a "regular and substantial portion" of his work time doing so. *Oakwood Healthcare*, 348 N.L.R.B. at 694; *see also* 29 U.S.C. § 152(11) (defining a "supervisor" as an "individual having authority, in the interest of the employer, to . . . assign, . . . discipline other employees, or responsibly to direct them, . . . if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment").

CVMC contends that Magsino performed supervisory functions as a relief charge nurse because Gilliatt testified that *she* had authority as a charge nurse to assign work and that Magsino's "duties" and "authority" as a relief charge nurse were "no different" from hers. But as the ALJ

correctly found, a manager's "conclusory testimony that employees have supervisory responsibilities," without more, fails to establish their supervisory status. *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 307 (6th Cir. 2012) (holding charge nurses were not supervisors despite conclusory testimony by director of nursing as to their authority to discipline); *G4s Regulated Sec. Sols.*, 362 N.L.R.B. No. 134, at *2 (June 25, 2015), *enforced* 670 Fed. App'x 697 (11th Cir. 2016).

CVMC also invokes the 2008 and 2010 stipulations in which it and the Union agreed that certain named charge nurses qualified as supervisors. But none of the supervisors named were Magsino, and these documents say nothing about Magsino's duties as of May 20, 2010. Even if they did, such "paper authority" does not establish supervisory status; rather, an employer must present evidence that the authority was actually exercised by the purported supervisor. *N. Mont. Health Care*, 178 F.3d at 1095; *Frenchtown*, 683 F.3d at 307–08 & n.5 (upholding Board's refusal to credit charge nurses' job descriptions that tracked language of statutory supervisor definition).

Even if Magsino performed nothing but supervisory functions as a relief charge nurse, the record belies CVMC's claim that Magsino's work as a relief charge nurse became regular after March 15, 2010. CVMC focuses on this date because it is when Gilliatt was promoted to director of the emergency room and so ceased working as a charge nurse. The implication, CVMC argues, is that Magsino stepped into Gilliatt's shoes. But the record does not bear this out. Magsino's shifts as a relief charge nurse in 2010 decreased from ten shifts in February to six shifts in April to only three shifts in May. Gilliatt also conceded that she assigned shifts to relief charge nurses only if charge nurses were not

available.    Far from "regular" work—meaning work "according to a pattern or schedule"—Magsino's shifts reflect exactly the "sporadic substitution" of one nurse for another that the Board has held indicates a lack of supervisory status.  *Oakwood Healthcare*, 348 N.L.R.B. at 694, 699 (employer failed to establish supervisory status of "rotating charge nurses" who substituted in for full-time charge nurses).

Having offered no evidence as to the percentage of Magsino's work time spent as a relief charge nurse (much less the portion spent on supervisory functions), CVMC seeks to fill the gap with the ALJ's observation that RNs "typically" work three shifts per week.  But an employer cannot substitute generalities for actual evidence of the amount of time its employees spent performing supervisory functions.  *N. Mont. Health Care*, 178 F.3d at 1095; *G4s Regulated*, 362 N.L.R.B. No. 134, at *2 ("[M]ere inferences or conclusory statements, without detailed, specific evidence, are insufficient to establish supervisory authority.").

Finally, CVMC argues that this court cannot affirm because the ALJ made no factual findings as to whether Magsino's supervisory functions were a regular and substantial portion of his work time.  This argument turns CVMC's burden on its head, as the *absence* of factual findings supporting supervisory status cannot justify reversal of the Board's decision.  Rather, "[b]ecause the [employer] bears the burden of proving statutory supervisory status, the Board must hold against the [employer] any lack of evidence on an element necessary to establish that status." *G4s Regulated*, 362 NLRB No. 134, at *2.  Moreover, the record suggests that the ALJ did not reach this factual issue because he correctly found that Gilliatt's conclusory

testimony failed to prove the threshold question of whether Magsino engaged in *any* supervisory functions. *See Providence Alaska Med. Ctr. v. NLRB*, 121 F.3d 548, 553– 55 (9th Cir. 1997) (charge nurses' "routine guidance to other RNs" and authority to "call in RNs or authorize overtime" failed to establish supervisory status).

In short, because the law and the record support the finding that Magsino's firing was pretextual and that he was not a supervisor, we affirm the finding that his discharge was an unfair labor practice.

### C. CVMC violated Section 8(a)(1) by serving subpoenas seeking information about confidential union activity protected by Section 7

Substantial evidence also supports the Board's finding that CVMC violated Section 8(a)(1) by serving subpoenas on employees and the Union seeking confidential information protected by Section 7 of the NLRA, 29 U.S.C. § 157, including communications with Union representatives and signed authorization cards.

"It is well settled that Section 7 of the NLRA gives employees the right to keep confidential their union activities." *Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1274 (D.C. Cir. 2012) (quoting *Guess?, Inc.*, 339 N.L.R.B. 432, 434 (2003)). Applying this rule, the Board here reasoned that "the breadth of the subpoenas at issue here and the nature of the information requested— encompassing communications between employees and the Union, union authorization and membership cards, and all documents relating to the distribution and/or solicitation of union authorization and membership cards—would subject employees' [Section 7] activities to unwarranted investigation and interrogation." (citing *Nat'l Tel. Directory*

*Corp.*, 319 N.L.R.B. 420, 421 (1995)).  In rejecting CVMC's argument that employees' rights could be safeguarded by having a hearing officer conduct an in-camera inspection of the documents CVMC sought, the Board explained that the "the harm is in the very request itself, which would have a chilling effect on employees' willingness to engage in (or refrain from) protected activities." (citing *Pac. Molasses Co. v. NLRB*, 577 F.2d 1172 (5th Cir. 1978)).

### i.   An employer cannot circumvent the NLRA's protections

CVMC raises several disparate arguments, none of which are persuasive.  CVMC first argues that its subpoena requests had no chilling effect because Union supporters had "outed" themselves in Union campaign posters featuring their photos.  This argument simply ignores the harmful effect that an employer's demand for information has on *all* workers, any one of whom might be dissuaded from union activity if they think an employer may learn of it.  *See Nat'l Tel.*, 319 N.L.R.B. at 421 (quashing employer's subpoena seeking union authorization cards due to their "chilling effect"); *NLRB v. Maxwell*, 637 F.2d 698, 702 (9th Cir. 1981) ("If an employee knows that his statements may become available to his employer, he is certainly less likely to make a candid statement to the Board."); *Comm. on Masonic Homes of R. W. Grand Lodge, F. & A. M. of Pa. v. NLRB*, 556 F.2d 214, 221 (3d Cir. 1977) ("[I]t is entirely plausible that employees would be 'chilled' when asked to sign a union card if they knew the employer could see who signed.").

Next, CVMC contends that the Board should have balanced employees' Section 7 rights against CVMC's interest in obtaining information to support its election objection alleging that supervisor support tainted the

election results.   But no such balancing is required to determine an employer's liability for an unfair labor practice, as the NLRA's mandatory language makes clear that an employer's desires cannot eclipse employees' rights. *See* 29 U.S.C. § 158 ("It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7).   Moreover, CVMC had no interest to balance because the overbroad subpoenas included requests for information (e.g. union activity by non-supervisors) that were irrelevant to CVMC's election objection, as the ALJ held in a decision affirmed by the D.C. Circuit. *See Veritas*, 671 F.3d at 1274.  Nor does it matter that the subpoenas also contained other requests that the ALJ deemed relevant to CVMC's election objection, as CVMC chose not to limit its subpoenas to that information.[14]   *See Dilling Mech. Contractors, Inc.*, 357 N.L.R.B. 544, 546 (2011) (employer violated Section 8(a)(1) by serving discovery requests seeking Section 7 information not relevant to its lawsuit).

CVMC also attempts to distinguish a case cited by the Board, *Pacific Molasses Co. v. NLRB*, 577 F.2d 1172 (5th Cir. 1978), because there the court denied an employer's Freedom of Information Act ("FOIA") request to obtain information protected by Section 7, whereas CVMC here used a subpoena.  But the method by which CVMC sought to obtain information to which it was not entitled is a distinction without a difference, as the Board has implicitly

---

[14] CVMC also argues that the Board's failure to cite the D.C. Circuit's decision prevents us from, consistent with its holding, affirming on the ground that the subpoenas sought irrelevant information.  No case supports the notion that we must remand for the Board to engage in a superfluous rebalancing of an interest that has already been determined to be non-existent by another court.

recognized in relying on FOIA cases to quash subpoenas. *See Nat'l Tel.*, 319 N.L.R.B. at 421 (quashing employer's subpoena request for Section 7 information and citing to *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978), which rejected an employer's FOIA request).

CVMC similarly challenges the propriety of the Board's citation to *National Telephone*, which quashed an employer's subpoenas that sought production of authorization cards signed by employees and other documents relating to union activity. 319 N.L.R.B. at 420, 422. CVMC argues that the case did not determine whether an unfair labor practice had occurred and that the employer there sought information which, CVMC contends, was less relevant than that which it sought here. This critique ignores the purpose for which the Board cited *National Telephone*, which was simply for the well-established law that union activity is protected from employers' prying eyes.

Finally, CVMC briefly argues that, because the Board has occasionally in other cases introduced into evidence signed authorization cards to prove a union majority, CVMC should be able to obtain similar information. This is a false equivalency. That the NLRA empowers the Board to confirm a union's majority support among workers does not excuse an employer from committing an unfair labor practice in an effort to overturn a union election.

### ii. The *Noerr-Pennington* doctrine does not immunize CVMC from unfair labor practice liability

CVMC alternatively invokes the *Noerr-Pennington* doctrine to argue that its service of subpoenas was protected from unfair labor practice liability by the First Amendment's Petition Clause. CVMC's arguments lack merit.

Originating as a shield against antitrust liability, the *Noerr-Pennington* doctrine provides that concerted efforts to petition the government that would otherwise be illegal may nonetheless be protected by the First Amendment's Petition Clause when certain criteria are met. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). While the Supreme Court has intimated that the *Noerr-Pennington* doctrine may cover some lawsuits by unions or employers that are "reasonably based," *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 536 (2002), it has exempted from such protection those employer lawsuits that are preempted by the NLRA or—as here—have an "objective that is illegal under federal law." *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983); *Diamond Walnut Growers*, 53 F.3d at 1089.[15] The *Noerr-Pennington* doctrine does not encompass the latter lawsuits because an employer's First Amendment rights "cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in [Section] 7 and protected by [Section] 8(a)(1)" of the NLRA. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969); *White v. Lee*, 227 F.3d 1214, 1236–37 (9th Cir. 2000) (explaining that an employer's "unfair labor practice under the NLRA does not receive full First Amendment protection" because employees' associational rights limit the reach of *Noerr-Pennington* in the NLRA context); *NLRB v. Associated Gen. Contractors of Cal., Inc.*, 633 F.2d 766, 772 n.9 (9th Cir. 1980) (holding employer conduct that "would otherwise be protected" under the First Amendment "may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor relations in the public interest").

---

[15] *BE & K* "left undisturbed" this exemption from *Bill Johnson's*. *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 492 (9th Cir. 2010).

CVMC's demands for confidential Section 7 information, including information irrelevant to its election objection, fall outside the protection of the *Noerr-Pennington* doctrine because, as discussed earlier, CVMC's conduct reflects an illegal objective. Our conclusion is bolstered by *Wright Electric, Inc. v. NLRB*, which enforced the Board's order against an employer whose discovery requests, like CVMC's subpoenas, improperly sought signed union authorization cards. 200 F.3d 1162, 1167 (8th Cir. 2000). The court reasoned that, "[b]ecause it is unlawful under § 8(a)(1) of the NLRA for an employer to discover or attempt to discover the identities of employees who have signed union authorization cards," the discovery requests had "an illegal objective" that removed them from the First Amendment's protection. *Id.* (citing *Bill Johnson's*, 461 U.S. at 737 n.5). The court also noted that the information sought was "not relevant" to the employer's claims. *Id.* That reasoning, which the Board has followed for years and which our sister circuits have upheld, applies with equal force to bar CVMC's conduct here. *See Dilling*, 357 N.L.R.B. at 546 (holding discovery requests violated Section 8(a)(1) and, because request for union members' names reflected an "illegal objective," rejecting argument that *BE & K* dictated different result); *Santa Barbara News-Press*, 358 N.L.R.B. 1539, 1540–42 (2012), *incorporated by reference in* 361 N.L.R.B. No. 88 (Nov. 3, 2014), *enforced sub nom. Ampersand Publ'g v. NLRB*, No. 15-1074, 2017 WL 1314946, at *4 (D.C. Cir. Mar. 3, 2017) (same).

Alternatively, *Noerr-Pennington* does not immunize CVMC from liability because its demands for employees' confidential information are not direct petitioning. Outside the labor law context, the Supreme Court has recognized two types of conduct that may be protected under the *Noerr-Pennington* doctrine: (1) "direct" conduct, such as a lawsuit,

which seeks to influence governmental action[16]; and (2) conduct "incidental" to direct conduct, such as sending a pre-litigation settlement demand letter.[17]  *See Venetian Casino Resort, L.L.C. v. NLRB*, 484 F.3d 601, 611 (D.C. Cir. 2007).    The Supreme Court "has extended *Noerr-Pennington* immunity into labor law only to protect direct petitioning, i.e., employer lawsuits," but not to protect indirect petitioning.  *Id.* at 612.

In rejecting CVMC's Petition Clause argument, the Board relied on *Santa Barbara News-Press*, a well-reasoned decision which held that the Petition Clause did not immunize an employer from unfair labor practice liability where, as here, the employer's subpoenas sought confidential Section 7 information from several employees. *See* 358 N.L.R.B. at 1541.  There, the employer obtained subpoenas from the Regional Director and caused them to be served on employees.  *Id.* at 1539, 1541.  The Board reasoned that this conduct "clearly did not constitute direct petitioning" because the employer did not seek to influence any government agency.  *Id.* at 1541.  To the extent the Regional Director was involved, it was purely in a "ministerial capacity" because the Regional Director was

---

[16] *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[17] *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006). To the extent CVMC urges us to expand *Noerr-Pennington* immunity beyond the bounds recognized by the Supreme Court, CVMC's failure to even mention incidental petitioning or any case addressing the concept in its conclusory, one-paragraph argument before the Board deprives this court of jurisdiction to consider it.  *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982); 29 U.S.C. § 160(e) ("[n]o objection that has not been urged before the Board . . . shall be considered by the court").

required by law to "process such requests in a nondiscretionary manner." *Id.*; *see also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (the Petition Clause does not "imply a duty of the government to make every government employee a petition receiver"). The Board also highlighted the mismatch between the purported petitioning—the employer's request for subpoenas from the Regional Director—and the conduct giving rise to the unfair labor practice—the employer's use of those subpoenas to demand that employees produce their confidential Section 7 information. *Santa Barbara News-Press*, 358 N.L.R.B. at 1541.

Here, there is the same mismatch between the conduct giving rise to CVMC's unfair labor practice liability and the conduct it characterizes as protected petitioning—which, in any event, is not direct petitioning. In demanding its employees' confidential Section 7 information, CVMC was attempting to influence its employees, not the government. Such conduct does not merit First Amendment protection because "what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation." *Gissel Packing*, 395 U.S. at 617–18. To hold otherwise would eviscerate the protections of the NLRA and the First Amendment associational rights of employees embodied in it, as employers could simply accomplish by subpoena that which they are barred from doing by law. *See id.* at 617.

### D. CVMC's unfair labor practices warranted the Board's remedy of a reading order

To remedy CVMC's unfair labor practices, the ALJ ordered that CVMC schedule meetings of all its employees,

during paid work time, so that the Board's Notice to Employees could be read to them with a Union representative present. The Board affirmed that order. The Board is vested with "broad discretion to devise remedies that effectuate the policies of the Act," *Sure-Tan*, 467 U.S. at 898–99, and its reading order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Va. Elec.*, 319 U.S. at 540.

Contrary to CVMC's characterization, a reading order is not an extraordinary remedy but rather an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance." *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016) (emphasis added); *U.S. Serv. Indus. Inc.*, 319 N.L.R.B. 231, 232 (1995), *enforced* 107 F.3d 923 (D.C. Cir. 1997). The reading order here was clearly warranted in light of CVMC's several unfair labor practices, including its retaliatory firing of a prominent Union supporter. And given CVMC managers' participation in the serious and widespread interference with its employees' rights, the Board was well within its discretion to require that a manager read the order aloud "so that employees will fully perceive that [CVMC] *and its managers* are bound by the requirements of the [NLRA]." *Federated Logistics & Operations, a Div. of Federated Corp. Servs., Inc. v. NLRB*, 400 F.3d 920, 930 (D.C. Cir. 2005) (citation omitted).

CVMC nonetheless argues that the Board cannot remedy the chilling effect of CVMC's illegal activity with a reading order because doing so would humiliate management, relying on a Ninth Circuit dissent and two decades-old

cases[18] that have "clearly been superseded" by more recent decisions that have "approved a public reading requirement." *Conair Corp. v. NLRB*, 721 F.2d 1355, 1386 n. 99 (D.C. Cir. 1983) (enforcing reading order); *see J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 539 (5th Cir. 1969) (same). Setting aside this misplaced reliance on irrelevant cases, we fail to see why management's sensibilities should play any role in the determination of an appropriate remedy to address its illegal conduct. After all, "part of the medicine is the traditional acknowledgement that the employer has, but will not again, deny employees' rights." *J.P. Stevens*, 417 F.2d at 540. Nothing in the NLRA protects an employer from the embarrassment it might experience as a byproduct of the Board's remedy, as an employer's feelings are obviously "outweighed by the necessity of effectuating the policies of the National Labor Relations Act." *Id.* at 539.

Finally, CVMC faults the Board for not detailing its reasons for approving the reading order and the ALJ for omitting quotation marks when using language from a case. But no authority requires a more detailed analysis than the Board or the ALJ provided here.[19]

---

[18] *Int'l Union of Electric, Radio & Machine Workers v. NLRB*, 383 F.2d 230 (D.C. Cir. 1967); *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859 (5th Cir. 1966).

[19] We reject CVMC's cursory argument that the Board's order is overbroad because it uses the term "employees" rather than RNs. Due to the argument's brevity and lack of citation to authority, it has been waived. *See W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012).

**E.  Remand is appropriate for the Board to address an unfair labor practice that was litigated and closely connected to the complaint**

We turn now to the Union's petition challenging the portion of the ALJ's decision that declined to address whether CVMC's written policy should be rescinded. Despite finding that CVMC's *oral* ban on employees communicating with the media was an unfair labor practice, the ALJ declined to address CVMC's *written* policy to the same effect on due process grounds because the written policy was not mentioned in the complaint or pursued by the General Counsel.   In doing so, the ALJ erred by not considering that, "where the issue is fully and fairly litigated at the administrative hearing, the Board may find an unfair labor practice even though no specific charge is made in the original complaint." *George C. Foss Co. v. NLRB*, 752 F.2d 1407, 1411 (9th Cir. 1985) (rejecting employer's due process argument); *Hi-Tech Cable Corp.*, 318 N.L.R.B. 280, 280 (1995), *enforced in relevant part*, 128 F.3d 271, 277 n.20 (5th Cir. 1997); *Pergament United Sales*, 296 N.L.R.B. 333, 334 (1989), *enforced* 920 F.2d 130 (2d Cir. 1990).

CVMC's written policy and oral ban on employees communicating with the media are closely connected— indeed, the ALJ described them as "related."   The written policy barred employees from making statements to the media "on behalf of . . . employees."  CVMC's own witness, Ruggio, testified that the written policy was the basis for CVMC's oral ban on employees communicating with the media, stating that manager Lex Reddy told employees "not to discuss hospital matters with the media[] because we do have policies in relation to discussing hospital matters with the media."   Moreover, the complaint alleges that Reddy's oral ban was an unfair labor practice.   The Supreme Court

and the Board have found no due process violation even where a far more tenuous connection existed between an unalleged unfair labor practice and the complaint. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 350–51 (1938) (rejecting due process challenge to unfair labor practice finding for wrongful discharge, even though operative complaint alleged failure to re-hire, because parties presented evidence on the issue); *Hi-Tech Cable Corp.*, 318 N.L.R.B. at 280 (rejecting challenge to findings of unfair labor practices committed by manager Jim French because his statements to employees that they could "get more without a union" had a "close connection" to complaint's allegation of unlawful promises of benefits by another managerial official).

In addition, CVMC fully litigated the issue of whether its ban on employees communicating with the media was an unfair labor practice, and the ALJ found that it was. In the course of this litigation, CVMC itself introduced the written policy and its witness authenticated and testified about it. On appeal, CVMC did not address the Union's argument seeking a ruling on the written policy. This non-opposition from the only party who could claim prejudice makes any due process concern ring especially hollow. Because due process does not bar the relief the Union seeks—rescission of the written policy—we grant the Union's petition and remand to the Board for resolution of that narrow issue at the compliance stage of the proceeding. *See SKS Die Casting & Machining, Inc. v. NLRB*, 941 F.2d 984, 990 (9th Cir. 1991); *Rea Trucking Co. v. NLRB*, 439 F.2d 1065, 1066 (9th Cir. 1971) ("The Board has an obligation to decide material issues which have been fairly tried by the parties even though they have not been specifically pleaded.").

## IV. Conclusion

In sum, we DENY CVMC's petition, except as to the incidental petitioning argument that we DISMISS for lack of jurisdiction because CVMC failed to raise it below.  We ENFORCE the Board's order.  We also GRANT the Union's petition and remand for the Board to address rescission of CVMC's written policy during the compliance stage consistent with this opinion.  Costs shall be taxed against CVMC.

**DENIED IN PART, DISMISSED IN PART, GRANTED AND REMANDED IN PART, and ENFORCED.**