## NATIONAL LABOR RELATIONS BOARD v. G. W. THOMAS DRAYAGE & RIGGING CO., Inc. et al.

### No. 13622.

United States Court of Appeals
Ninth Circuit.

Aug. 27, 1953.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Dominick L. Manoli, Atty., National Labor Relations Board, Washington, D. C., Dean E. Denlinger, Atty., National Labor Relations Board, Dayton, Ohio, and Louis Penfield, Atty., National Labor Relations Board, San Francisco, Cal., for petitioner.

Newell J. Hooey, Todd & Todd, Henry C. Todd, San Francisco, Cal., for respondents.

Before DENMAN, Chief Judge, and HEALY and ORR, Circuit Judges.

DENMAN, Chief Judge.

This is a petition to enforce an order of the National Labor Relations Board, hereafter the Board, pursuant to Section 10(e) of the Labor Management Relations Act, 29 U.S.C.A. § 160(e), hereafter the Act.

The questions presented by this petition are: (1) whether the facts as proven substantiate the charge; (2) whether rules of evidence were violated by the admission of hearsay evidence; (3) whether there was proof of the allegations of the complaint; and (4) whether the picketing involved was a constitutionally protected activity.

The International Association of Machinists, hereafter the Machinists, filed charges with the Board against the Millwrights Local Union No. 102, United Brotherhood of Carpenters and Joiners of America, hereafter Millwrights, and G. W. Thomas Drayage & Rigging Co., Inc., hereafter the Company. The Millwrights were charged with having caused or attempted to cause the Company to discriminate against one J. L. Myers, a member of the Machinists, in violation of Section 8 (a)(3) of the Act, thereby violating Section 8(b)(1) and (2) of the Act. The Company was charged with discriminating against Myers in violation of Section 8(a) (1) and (3) of the Act. A consolidated complaint was duly issued and hearings held thereon at which it was determined that the respondents had committed the acts charged. The Company and the Millwrights were ordered jointly and severally to make Myers whole for the pay thus lost. The Company has not resisted the enforcement.

In 1950 the Company was engaged in the installation of heavy machinery at the

Bevatron project of the University of California at Berkeley in connection with some work that the University was doing for the Atomic Energy Commission. In July of that year, Myers, a member of the Machinists, was hired by the Company to work on the project. About the same time, employees of another employer, members of the Millwrights, were working at the project. In mid-August, Curry, the business agent of the Millwrights, approached Myers and asked him if he belonged to the Machinists. On receiving an affirmative answer, Curry said that that was all he wished to know. Curry then spoke to Post, the Company's foreman on the job, objecting to the use of a Machinist and saying that the work should be done by Millwrights. Later, Curry, accompanied by another union official, called on Alton Wilson, a University engineer, and made the same objections. Both Post and Wilson informed Curry that they could do nothing about the matter. Curry told Wilson that if "something were not done soon to replace Myers with a Millwright they would take action to achieve that object even if it involved picketing the project."

On August 29, 1950, foreman Post removed Myers from the job and Myers was told by Post that "maybe" they could get this thing settled with the Millwrights. Myers was not employed by the Company from that time until September 18, at which time he reported for work at the Bevatron project. During the interval there was work which required one with Myers' abilities and the University was pressing to have this work done.

The re-employment of Myers was temporary and beset by difficulties, including a visit by Curry and other union officials to the project where they spoke to Post about Myers being on the job. Insofar as the Bevatron project was concerned, Myers' employment ceased on September 26, 1950, when a picket line was set up at the gate to the project. This picket line was composed at least in part of members of the Millwrights, including Curry. Both Post and Wilson heard Curry state that in order to have the picket line removed, it would be necessary to replace the Machinists in the employ of the Company with Millwrights. Myers was the only Machinist in the employ of the Company. Myers was then transferred to another job of the Company and was subsequently released when that job ended on October 24, 1950. He never was permitted to return to the Bevatron project, although there was work for him there and although the Company was willing to have him do the work if the Millwrights would agree. A member of the Millwrights was subsequently hired to do this work, and the Company's job at the Bevatron project was completed on January 16, 1951.

(A) *The Charge:*

█ The Millwrights complain that the facts proven do not substantiate the charge made by the Machinists. The gravamen of that charge is as follows:

"On or about August 29, 1950, it [the Millwrights], by its officers, agents or employees, caused or attempted to cause the G. W. Thomas Drayage & Rigging Co., Inc., to discriminate against J. L. Meyers, in violation of Section 8(a)(3) of the Act. * * *

"By the above acts, *and by other acts*, the labor organization named above has violated Section 8(b)(2) and 8(b)(1) of the Act." (Emphasis supplied.)

It contends that because the picketing did not occur until September 26, some twenty-eight days after the date contained in the charge, and because the ultimate discharge of Myers did not occur until October 24, 1950, the charge has not been proven. However, the evidence shows that on August 29, 1950, Myers was removed from the job due to pressure brought on the employer by the Millwrights because Myers was not a member of that union. This, in and of itself, is sufficient to substantiate the charge. Act, § 8(b)(2). See N.L.R.B. v. Swinerton, 9 Cir., 202 F.2d 511; N.L.R.B. v. Cantrall, 9 Cir., 201 F.2d 853.

It is not a fatal variance that the ultimate discharge of Myers did not occur until October 24, 1950, almost two months aft-

er the date alleged in the charge. Myers was discriminated against on August 29, 1950, as charged, when he was laid off because of pressure applied by the Millwrights. The fact that he was subsequently employed for a short period goes only to the issue of the amount of back pay to which he is entitled. Myers' ultimate discharge was a proximate result of the unfair labor practices occurring on or about August 29, 1950, and was a direct result of "other acts" amounting to unfair labor practices which occurred subsequent to August 29 but prior to the date the charge was filed.

### (B) The Evidence:

■ The Millwrights argue that the trial examiner erred in admitting hearsay in the record, but fail to refer to any specific instances of such hearsay. While it may be true that some evidence was introduced which was admissible against only one of the parties, the evidence relied upon to support the Board's findings is not inadmissible as to the Millwrights. Post's Wilson's and Myers' testimony as to statements made by Curry, if hearsay, were admissible against the Millwrights as admissions against interest made by an agent acting within the scope of and in the course of his agency. Murdock v. United States, 8 Cir., 160 F.2d 358; Rogers v. Edward L. Burton Co., 10 Cir., 137 F.2d 284. The rule of Consolidated Edison Company of New York v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, relied on by the Millwrights, that mere uncorroborated hearsay or rumor does not constitute substantial evidence, is inapplicable. There, the Supreme Court was speaking of the type of hearsay which courts hold inadmissible, and not of evidence which is competent before any court.

Furthermore, this testimony was not hearsay. It was direct testimony as to events which the witnesses perceived, Curry speaking the words. It was not introduced to prove the truth of the words spoken, but merely to prove that they were spoken by Curry. See 5 Wigmore on Evidence, § 1361.

### (C) The Complaint:

■ It is contended by the Millwrights that there was no proof of the allegations of certain paragraphs of the complaint. First, they argue that Paragraph VI does not state which employees were restrained and coerced in the exercise of their rights of self-organization. However, Paragraph VI refers to Paragraph III in which it is clearly apparent that Myers is the employee referred to.

■ Next, it is claimed that Paragraph VII, which accuses the Company of encouraging membership in the Millwrights and discouraging membership in other unions, was not proven because "there was no single word in the entire transcript * * concerning either the encouraging or discouraging of membership in any union." While it may be true that the words "encourage" or "discourage" were not used in any of the testimony, the record is replete with evidence that Myers was deprived of employment because he was a member of the Machinists and not a member of the Millwrights. There was testimony that Thomas' foreman had told Myers that the trouble could be cleared up if Myers would clear through the Millwrights. In view of this evidence, it cannot be said that the Board erred in holding that the Company encouraged membership in the Millwrights and discouraged membership in other labor organizations.

■ Lastly, in this connection the Millwrights contend that there was no showing that the labor dispute involved tended to burden interstate commerce. Suffice it to say in answer to this contention that sufficient evidence was introduced to show that the Company fell within the requirements for the exercise of the Board's jurisdiction as laid down in Hollow Tree Lumber Co., 91 N.L.R.B. 635; see also, N.L.R.B. v. Cantrall, 9 Cir., 201 F.2d 853, 855.

### (D) The Picketing:

■ The Millwrights' final argument is that the picketing involved was peaceful picketing and therefore protected as free speech under the Constitution. This ques-

 

tion was not raised before the Board, insofar as the record shows, and cannot be raised here for the first time absent some extraordinary circumstances excusing this failure. Act, § 10(c); N.L.R.B. v. Carlton Wood Products Co., 9 Cir., 201 F.2d 863.

The Order of the Board is ordered enforced.