**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD *Petitioner*, v. NORTH MOUNTAIN FOOTHILLS APARTMENTS, *Respondent*. | No. 24-2223 National Labor Relations Board NLRB No. 28-CA-286885 OPINION |

On Petition for Application for Enforcement of an Order of the National Labor Relations Board

Argued and Submitted July 11, 2025
San Francisco, CA

Filed October 28, 2025

Before: Holly A. Thomas and Ana de Alba, Circuit Judges, and Jed S. Rakoff, District Judge.[*]

Opinion by Judge Rakoff

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

## SUMMARY**

### Labor Law

The panel granted an application by the National Labor Relations Board ("NLRB") for enforcement of its order finding that North American Foothills Apartments ("NMFA") violated Section 8(a)(1) of the National Labor Relations Act.

The panel held that it had jurisdiction to adjudicate NMFA's unexhausted constitutional challenges to the NLRB, which it did not raise before the NLRB.

First, NMFA challenged a statutory provision—providing that an administrative law judge ("ALJ") could be removed "only for just cause," as determined by the Merit Systems Protection Board—on the ground that the provision violates Article II, which it argued vests the sole removal power over agency "officers" (such as the ALJ who initially rendered the order appealed from here) in the President. The President never sought to remove the ALJ who issued the order here.  The panel held that so long as an agency officer was validly appointed (which NMFA did not contest as to this ALJ), retrospective relief based on an unconstitutional removal provision is available only where the provision inflicts compensable harm.  The panel held that even if it assumed *arguendo* that the NLRB's for-cause protections were invalid, NMFA's failure to show harm precluded retrospective relief.

---

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Second, NMFA argued that the NLRB's adjudication scheme violated the Seventh Amendment by denying employers the right to a jury trial. The Supreme Court has squarely held that an NLRB unfair practice proceeding is not a "suit at common law" for purposes of the Seventh Amendment. The panel held that employers are not entitled to jury trials in cases involving *Thryv v., Inc. v. International Brotherhood of Electrical Workers, Local 1269*, 372 NLRB No. 22 (2022), remedies. Accordingly, the panel concluded that the Seventh Amendment was not implicated.

Third, NMFA argued that the combined investigatory and adjudicatory functions of the NLRB were inconsistent with separation of power principles such that the NLRB's decision violated NMFA's Fifth Amendment right to due process. The panel held that the combination of investigative and judicial functions within an agency does not, of itself, violate due process. NMFA did not argue that the NLRB confers both investigative and adjudicatory powers on a single individual within the agency, nor could it. NMFA also failed to demonstrate that either the NLRB's ALJs or its Board members had an unconstitutional potential for bias, such that the presumption of honesty and integrity should not apply to them. Accordingly, the panel rejected NMFA's due process challenge.

Turning to the merits, the panel held that NMFA had forfeited three of the NLRB's four findings that NMFA violated Section 8(a)(1) of the National Labor Relations Act.

As to the NLRB's finding that NMFA discharged an employee for engaging in actual or perceived concerted activities, the panel applied the test set forth in *Wright Line*, 251 NLRB 1083 (1980), and concluded that the NLRB's

finding that NMFA violated Section 8(a)(1) by discharging the employee for engaging in actual or perceived protected activities was supported by substantial evidence.

## COUNSEL

Kent J. Coupe (argued), Attorney; Amy H. Ginn, Supervising Attorney; David Habenstreit, Assistant General Counsel; Ruth E. Burdick, Deputy Associate General Counsel; Peter S. Ohr, Deputy General Counsel; Jennifer A. Abruzzo, General Counsel; National Labor Relations Board, Washington, D.C.; for Petitioner.

Jeffrey W. Toppel (argued), Bianchi & Brandt, Scottsdale, Arizona; Edmundo P. Robaina, Yen Pilch Robaina & Kresin PLC, Phoenix, Arizona; for Respondent.

Maneesh Sharma and Matthew Ginsburg, AFL-CIO, Washington, D.C., for Amicus Curiae American Federation of Labor-Congress of Industrial Organizations.

**OPINION**

RAKOFF, District Judge:

Respondent North Mountain Foothills Apartments ("NMFA") appeals the finding by the National Labor Relations Board ("NLRB") that NMFA violated Section 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act"). For the first time on appeal, NMFA raises multiple constitutional challenges to the NLRB's functions and structure, including challenges to the NLRB's for-cause removal protections, adjudication scheme, and combined investigatory and adjudicatory powers. NMFA also challenges the NLRB's decision on the merits. For the reasons explained below, we reject these arguments and grant the NLRB's application for enforcement.

I.

Carrie Matteson and Michael Gareau own NMFA, which rents and manages apartments, including the 194-unit North Mountain Foothills Apartment Complex ("the Complex") in Phoenix, Arizona. During the period giving rise to this litigation, Matteson served as NMFA's operations manager, Noemi Soto served as the property manager, and Lisa Stearns served as the assistant property manager. Together, Matteson, Soto, and Stearns supervised various maintenance technicians, including James Cosgrove, Jose Diaz, Dwayne Mims, Joe Scott, Tyler Spence, and "Cassidy."[1]

During the summer of 2021, Phoenix suffered a heatwave. Due to an outdated HVAC system, the Complex experienced a significant increase in the number of work

---

[1] As the Board explains in its decision, Cassidy's last name is unknown.

orders, leading NMFA to advertise for an "Apartment Maintenance Technician/General Laborer/Handyman." Jasper Press applied for the position. Matteson was impressed by his experience working with HVAC systems and offered him the job. She then emailed him to inform him that he would be paid $25 per hour and receive access to a three-bedroom apartment in the Complex in lieu of a bonus. In the email, she stated that the apartment was "a monthly $1500 investment from the company," so NMFA "would be looking for high performance, reliable/dependable/quality work and skills that contribute to increased [return on investment] over the course of the year."

On August 10, Press began working at the Complex. That day, he was assigned to complete a work order with Diaz. While he and Diaz were working on the order, Press mentioned to Diaz that there was a large backlog of work orders, but that the "challenge" was "worth it because [he] was being paid $25 an hour" and "had a $1,500 [monthly] housing subsidy." Press also commented on the "dilapidated condition" of the Complex, including the "infestation of cockroaches" and "constant leaks from aging equipment." While Press and Diaz completed the work order, the tenant who had placed the order informed them that she had already had to move from a different unit in the Complex due to cockroaches. Press responded that NMFA would "work on correcting the issue." Later that same day, Press was working with Cassidy on a different assignment and similarly told her that he was up to the "challenge" of completing the numerous work orders because of his hourly wage and housing subsidy. He also told Cassidy that he thought the Complex was in "poor condition," which "made working there difficult."

Press also discussed his hourly rate and housing subsidy with two additional workers, Scott and Cosgrove. Cosgrove proceeded to tell Mims that Press had mentioned his compensation package, which Mims later reported to Soto. Although NMFA did not have a policy that prohibited workers from discussing their wages, Mims believed that Press should not have been discussing his compensation with others. On Press's second day of work, August 11, Diaz, Mims, and Scott had to complete work orders that were originally assigned to Press. Diaz then told Soto that Press had failed to complete his assignments that day.

On the morning of August 12, Matteson approached Press by the mailboxes outside the Complex's leasing office. According to Press, Matteson appeared "upset" because she was "talking faster than normal" and her voice was "higher than normal." Matteson asked Press whether he knew anything about why the other workers knew how much he was earning. Press falsely said that he did not know how the other workers learned this information, but that it was possible that someone had overheard him talking to his wife on the phone. Matteson told Press that they would have another discussion about the issue and walked away.

A few hours later, Press met with Matteson and Soto for a closed-door meeting, which he secretly recorded. Matteson began the meeting by telling Press that she had heard that other employees knew about his hourly rate and housing benefit. Over the course of the conversation, she stated that this was making her "life really tough," that it had become "just this red-hot issue," that Press had created a "crisis situation," that she now had a "hornets' nest to deal with," and that she had to "figure out damage control on [her] end." She stated that she had heard that Press did not want to live in the Complex because of pests, which Press dismissed as

an exaggeration. Matteson told Press that "this [was] a really bad kick-off" and that she was not sure that their working relationship could be fixed because the "trust and confidentiality" had "already [been] chiseled away at." When Press stated that he was "very sorry that everybody [knew] how much [he was] being paid," Matteson responded, "So am I." Matteson then forbade Press from discussing pest control issues with residents and stated that "[his] work conditions [were] nobody's business but [his] except for that now everyone [was] aware of them." Finally, Matteson stated that although camaraderie was an important part of the job, "this whole situation [had] not built camaraderie at all." When Press asked Matteson whether "[t]his situation" referred to the other workers "knowing [his] wage," Soto responded, "[a]nd [your] housing and all that other stuff," and indicated that Press's discussions with the other workers had "backfired, really bad."

On August 13, Press's fourth day at NMFA, Press worked his entire shift without incident. That evening, after close of business, Soto called Press and informed him that he was being discharged for failing to complete his work orders. After Press disputed that he had not completed his work orders, the conversation ended.

## II.

Based on the foregoing facts, Press filed a complaint with his regional office of the NLRB alleging that NMFA had engaged in unfair labor practices. After an evidentiary hearing before an administrative law judge ("ALJ"), the NLRB found that NMFA had violated Section 8(a)(1) of the NLRA by (1) interrogating Press about his discussions about his compensation with other workers at the Complex, (2) "orally promulgat[ing] an overly broad and

discriminatory directive prohibiting [Press] from discussing" his compensation with other workers at the Complex and "prohibiting him [from] discussing pest control issues with third parties," (3) "threaten[ing] [Press] with unspecified reprisals if he continued to engage in protected activities," and (4) "discharg[ing] Press for engaging in actual or perceived protected activities."

Based on those findings, the NLRB, by order dated February 21, 2024, ordered NMFA to cease and desist from engaging in all four violations with respect to Press and from "interfering with, restraining, or coercing" other employees in their "exercise of the rights guaranteed them by [the NLRA]" in any similar or related manner. The order also required NMFA to offer to reinstate Press within fourteen days, make Press whole for any loss of earnings or benefits, compensate Press for any adverse tax consequences of a lump sum backpay, remove any reference to Press's discharge from its files, and post a remedial notice.

On appeal, NMFA challenges the NLRB's order on four grounds. Three of these grounds, involving constitutional challenges to the NLRB's structure and function, were never raised below. Specifically, NMFA argues that the NLRB's for-cause removal protections violate Article II of the U.S. Constitution, that its adjudication scheme violates the Seventh Amendment right to a jury trial, and that its combined investigatory and adjudicatory powers are inconsistent with the separation of powers and therefore violate the Fifth Amendment right to due process. As a fourth ground, NMFA argues that the Board's findings were not supported by substantial evidence.

In its answering brief, the NLRB opposed these arguments on multiple grounds, one of which it subsequently

withdrew. The NLRB first argued that we lack jurisdiction to hear NMFA's constitutional claims because NMFA failed to raise them before the NLRB. The NLRB also initially argued that, in any event, each and all of NMFA's constitutional claims failed on the merits. Finally, on the merits of the Board's order, the NLRB argued that NMFA had abandoned or forfeited various challenges to its findings and that NMFA's preserved challenges failed because the NLRB's findings were supported by substantial evidence. For all of these reasons, the NLRB asked that we reject NMFA's arguments and enter a judgment enforcing its order.

Five months later, however, on February 21, 2025, the NLRB filed a 28(j) letter "notif[ying] the Court that it no longer presses the argument in its brief regarding the constitutionality of the removal protections for NLRB Board members and administrative law judges." Letter from Ruth E. Burdick, Deputy Assoc. Gen. Couns., NLRB to Molly C. Dwyer, Clerk of the Ct. for the U. S. Ct. of Appeals for the Ninth Cir. 1 (Feb. 21, 2025) (hereinafter "February Letter"). That letter is consistent with the current administration's position that the NLRB's for-cause removal protections do in fact violate Article II. *See* Application to Stay the Judgments at 12, *Trump v. Wilcox*, No. 24A966 (filed Apr. 1, 2025) ("[T]his Court's precedents establish that Article II empowers the President to remove, at will, members of multimember boards that wield substantial executive power, such as the NLRB . . . ."). Both parties now agree that if the issue is properly before us, the NLRB's for-cause removal protections should be deemed to violate Article II. The NLRB argues, however, that those statutory removal provisions are not properly before us and that, if they were,

such challenges would fail because NMFA has not met the causal-harm requirement. February Letter at 1.

### III.

We review questions of jurisdiction and of constitutional law *de novo*. *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129 (9th Cir. 2021). If we reach the merits of the Board's decision, we "must uphold a Board decision when substantial evidence supports its findings of fact and when the agency applies the law correctly."[2] *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 777 (9th Cir. 2017).

### A.

We first consider whether we have jurisdiction to adjudicate NMFA's constitutional challenges to the NLRB. Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). NMFA argues that its constitutional challenges, which it did not raise before the NLRB, qualify as "extraordinary circumstances," so that we nevertheless have jurisdiction to consider them. The NLRB disagrees, and two of our sister circuits are divided on this issue. *See Noel Canning v. NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013) (exercising jurisdiction over an extraordinary circumstances exception in an unexhausted constitutional challenge to the NLRB's authority); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 796–98 (8th Cir. 2013) (reaching the opposite conclusion in the same context).

---

[2] Unless otherwise indicated, all quotations omit internal alterations, brackets, citations, ellipses, quotations, and quotation marks.

Though we have not specifically considered this question before, we receive considerable guidance from our previous decisions. In *Reid v. Engen*, for instance, we held that we "may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it." 765 F.2d 1457, 1461 (9th Cir. 1985). "This situation," we explained, "is typified by challenges to the constitutionality of a statute or challenges to the constitutionality of a regulation promulgated by the agency." *Id.*; *see also Marathon Oil Co. v. United States*, 807 F.2d 759, 768 (9th Cir. 1986) (explaining that we may consider issues that "implicate[] the constitutionality of a statute or regulation where the agency does not have power to correct a claimed grievance"). Indeed, as the Supreme Court itself stated in *Califano v. Sanders*, "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." 430 U.S. 99, 109 (1977). "[W]hen constitutional questions are in issue, the availability of judicial review is presumed . . . ." *Id.*

Allowing courts to review unexhausted constitutional claims concerning an agency's enabling statute makes good sense. As the Supreme Court recently observed in *Carr v. Saul*, echoing our reasoning in *Reid*, "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." 593 U.S. 83, 92 (2021); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."). The Supreme Court also emphasized that it had "consistently recognized a futility exception to exhaustion requirements." *Carr*, 593

U.S. at 93. As that exception itself recognizes, it "makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested," as such a "vain exercise" will "rarely protect administrative agency authority or promote judicial efficiency." *Id.*

The NLRB's limited arguments to the contrary are unpersuasive. The agency argues that "[t]he text of Section 10(e) makes no exception for constitutional claims" and that both we and the Supreme Court "have therefore consistently recognized that Section 10(e) applies with equal force when a party attempts to raise new constitutional arguments." However, each of the cases that the NLRB cites where plaintiffs were prohibited from raising constitutional arguments in judicial proceedings that they had not exhausted before the agency involved an unexhausted challenge to an agency's decision, not an unexhausted constitutional challenge to the workings of the agency itself. *See, e.g.*, *Int'l Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975) (due process claim); *NLRB v. G.W. Thomas Drayage & Rigging Co.*, 206 F.2d 857, 860–61 (9th Cir. 1953) (First Amendment claim). In another case cited by NLRB, moreover, the Court found that "extraordinary circumstances" warranted considering the unexhausted claim. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896 n.7 (1984) (First Amendment claim).

We therefore conclude that we have jurisdiction to consider NMFA's constitutional challenges.

## B.

We turn now to NMFA's constitutional challenges. The first such challenge is to the statutory provision that an ALJ (such as the one who initially rendered the order appealed

from here) can be removed "only for good cause," as determined by the Merit Systems Protection Board. 5 U.S.C. § 7521. The NMFA contends that this provision violates Article II, which it argues vests the sole removal power over agency "officers" like this ALJ in the President. However, the Supreme Court has traditionally recognized two exceptions to that rule: (1) "principal officers" in multimember expert bodies that perform "quasi[-]legislative or quasi[-]judicial" functions, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 628–29 (1935); and (2) "inferior officer[s]," *Morrison v. Olson*, 487 U.S. 654, 689–93 (1988). The Supreme Court recently granted a stay of an order enjoining the President from removing an NLRB member. *See Trump v. Wilcox*, No. 24A966 (May 22, 2025). And, while this issue is still pending before the Supreme Court, and *Humphrey's Executor* remains good law, the NLRB, in the letter to this Court on February 21, 2025, effectively withdrew its opposition to the NMFA's argument that the "for cause" provision is unconstitutional.

However, the NLRB went on in the Letter to mention its alternative argument that the supposed unconstitutionality of the "for cause" provision was irrelevant in an absence of harm. Put another way, a federal court does not sit to decide abstract disputes that have no impact on the case at hand. *See Richardson v. McChesney*, 218 U.S. 487, 492 (1910). Specifically, the President never sought to remove the ALJ who issued the order here. So long as an agency's officers are validly appointed (which NMFA does not contest as to this ALJ), retrospective relief based on an unconstitutional removal provision is available only where the provision "inflict[s] compensable harm." *Collins v. Yellen*, 594 U.S. 220, 259 (2021); *see also CFPB v. CashCall, Inc.*, 35 F.4th 734, 742 (9th Cir. 2022) ("[A]t a minimum, the party

challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party."). To satisfy the harm requirement, a party must demonstrate that the challenged action or decision was taken by an officer the President sought to but could not remove, or that the removal provision otherwise affected or influenced the challenged action or decision. *See CashCall, Inc.*, 35 F.4th at 743; *see also Collins*, 594 U.S. at 259–60 (discussing the harm requirement).

Despite the NLRB's continued reliance on this requirement, NMFA does not discuss the harm requirement in its briefing, much less demonstrate that it is satisfied in this case. Therefore, its for-cause removal challenge necessarily fails on the merits. That is, even if we assume *arguendo* that NLRB's for-cause protections are invalid, NMFA's failure to show the slightest harm precludes retrospective relief.

We next turn to NMFA's argument that the NLRB's adjudication scheme violates the Seventh Amendment by denying employers the right to a jury trial.

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const., amend. VII. To determine whether an action is one "at common law," or otherwise, courts consider whether the action is akin to an action that would have traditionally been brought before a court of law or a court of equity and whether the remedies sought are legal or equitable in nature. *See SEC v. Jarkesy*, 603 U.S. 109, 122–23 (2024). However, because some causes of action sound in both law and equity, the primary nature of the remedy is the "more important consideration." *Id.* at 123.

The Supreme Court has squarely held that an NLRB unfair practice proceeding is not a "suit at common law" for purposes of the Seventh Amendment. In *NLRB v. Jones & Laughlin Steel Corp.*, the Supreme Court considered a Seventh Amendment challenge to the NLRB's adjudication scheme. 301 U.S. 1, 25 (1937). Applying the two-part test outlined above, the Supreme Court reasoned that an NLRB unfair practice proceeding was "one unknown to the common law" because it was "a statutory proceeding" and that "[r]einstatement of the employee and payment for time lost" were "remedies appropriate to its enforcement," so that any "contention under the Seventh Amendment [was] without merit." *Id.* at 48–49. In subsequent decisions concerning the constitutionality of other adjudication schemes, the Supreme Court has continued to cite *Jones* as a case concerning an adjudicatory proceeding that does not implicate the Seventh Amendment. *See Jarkesy*, 603 U.S. at 137–38 (quoting *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 453 (1977)).

NMFA nevertheless argues that the NLRB's adjudication scheme violates the Seventh Amendment based on the NLRB's recent recognition of so-called "*Thryv* remedies." In *Thryv, Inc. and International Brotherhood of Electrical Workers, Local 1269*, the Board clarified that make-whole relief may address "all direct or foreseeable pecuniary harms" that "employees suffer as a result of [an employer's] unfair labor practice." 372 NLRB No. 22, at *1 (2022). "Direct harms" refer to harms "in which an employee's loss was the direct result of the [employer's] illegal conduct," while "foreseeable harms" refer to harms which the employer "knew or should have known would be likely to result from its violation of the Act, regardless of its intentions." *Id.* at 20. NMFA suggests that those remedies

"sound in tort" and are "clearly compensatory damages," so that it was entitled to a jury trial under the Seventh Amendment in this case.

After briefing concluded in this case, we decided a different case concerning *Thryv* remedies that, while not controlling on the jury trial question, nevertheless foreshadowed our decision here. In *Macy's, Inc. v. NLRB*, we were tasked with determining whether the NLRB had "improperly authorize[d] itself to award full compensatory damages" in *Thryv* by awarding damages "for purportedly foreseeable financial harms." No. 23-150, slip op. at 36 (9th Cir. Oct. 21, 2025). In concluding that the NLRB had not exceeded its authority, we clarified that *Thryv* remedies are "designed solely to restore the status quo" and are therefore "equitable in nature." *Id.* at 37 n.11. As we explained, "make-whole remedies do not punish bad actors, but rather implement the statutory principles of rectifying the harms actually incurred by the victims of unfair labor practices and restoring them to where they would have been but for the unlawful conduct." *Id.*

For reasons not relevant here, we ultimately "decline[d] to entertain" the issue of whether employers were entitled to jury trials in cases involving *Thryv* remedies. *Id.* at 35 n.10. With that issue now squarely before us, we answer *no*.

As we held in *Macy's*, *Thryv* remedies are equitable in nature. In *Jarkesy*, the Supreme Court held that "monetary relief can be legal or equitable." 603 U.S. at 123. The determinative question is whether the remedy "is designed to punish or deter the wrongdoer, or, on the other hand, solely to restore the status quo." *Id.* Because the relevant factors in *Jarkesy* "tie[d] the availability of civil penalties to the perceived need to punish the defendant rather than to

restore the victim," the Court held that those remedies were legal, rather than equitable in nature. *Id.* at 123–24.

Here, however, there can be no doubt that *Thryv* remedies are intended to restore the status quo. The Board specifically explained that this remedy "do[es] not punish bad actors, but rather implement[s] the statutory principles of rectifying the harms actually incurred by the victims of unfair labor practices and restoring them to where they would have been but for the unlawful conduct." *Thryv, Inc.*, 372 NLRB No. 22, at *17 (2022), *enforcement denied on other grounds*, 102 F.4th 727 (5th Cir. 2024). Accordingly, the Seventh Amendment is not implicated.

We turn finally to NMFA's argument that the combined investigatory and adjudicatory functions of the NLRB are inconsistent with separation of power principles such that the NLRB's decision violated NMFA's Fifth Amendment right to due process. Like NMFA's Seventh Amendment challenge, this argument fails on the merits.

Both we and the Supreme Court have long held that "[t]he combination of investigative and judicial functions within an agency does not, of itself, violate due process." *United States v. Litton Indus., Inc.*, 462 F.2d 14, 16 (9th Cir. 1972) (citing *FTC v. Cement Inst.*, 333 U.S. 683, 700–02 (1948)); *see also Hirsh v. Justices of the Sup. Ct. of Cal.*, 67 F.3d 708, 714 (9th Cir. 1995). Rather, in determining whether an agency's functions give rise to a due process violation, we consider whether a single individual is tasked with performing both investigatory and adjudicatory functions and "whether the average judge in the adjudicator's position is likely to be neutral, or whether there is an unconstitutional potential for bias." *William Jefferson & Co. v. Bd. of Assessment & Appeals*, 695 F.3d 960, 964

(9th Cir. 2012). Moreover, to prevail on a due process challenge sounding in the separation of powers, the challenger must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Id.*

NMFA has not demonstrated that the NLRB runs afoul of either criterion. To start, NMFA has not argued that the NLRB confers both investigative and adjudicatory powers on a single individual within the agency. Nor could it. While the General Counsel supervises the NLRB's investigatory function, the Board is responsible for performing its adjudicatory function. *See* 29 U.S.C. § 153(d). We recognized this division of authority in *NLRB v. Aaron Bros. Corp.*, in which we summarily rejected a claim that the NLRB's regional directors impermissibly exercised both investigative and adjudicative functions. 563 F.2d 409, 413 (9th Cir. 1977) (per curiam) ("It is this combination of responsibilities which the Company argues denied it Due Process. The claim is not well founded."). As the Supreme Court and the D.C. Circuit have explicitly recognized, "[t]his bifurcated structure reflects the intent of the Congress 'to differentiate between the General Counsel's and the Board's final authority along a prosecutorial versus adjudicative line.'" *NLRB v. Fed. Lab. Rels. Auth.*, 613 F.3d 275, 278 (D.C. Cir. 2010) (quoting *NLRB v. United Food & Com. Workers Union, Local 23*, 484 U.S. 112, 124 (1987)).

NMFA has also failed to demonstrate that either the NLRB's ALJs or its Board members have an "unconstitutional potential for bias," such that the "presumption of honesty and integrity" should not apply to them. *William Jefferson & Co.*, 695 F.3d at 964. Indeed, in its briefing, NMFA does not even argue, much less demonstrate, that ALJs and Board members exhibit "actual bias" or that any "pecuniary or personal interest" that they

might have in the outcome of the proceedings over which they preside creates even an "appearance of partiality that violates due process." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (emphasis removed). We thus reject this further challenge to the constitutionality of the NLRB's structure.

## C.

Finally, NMFA challenges the NLRB's decision on the merits. The NLRB found that NMFA had violated Section 8(a)(1) of the NLRA by (1) "interrogat[ing] Press about discussing his wages," (2) "orally promulgat[ing] an overly broad and discriminatory directive prohibiting [Press] from discussing his wages and housing subsidy with other employees and prohibiting him [from] discussing pest control issues with third parties," (3) "threaten[ing] [Press] with unspecified reprisals if he continued to engage in protected activities," and (4) "discharg[ing] Press for engaging in actual or perceived protected activities."

Three of the four findings are not properly before us. Below, NMFA failed to raise any contention regarding whether there was substantial evidence that it had repeatedly questioned Press about discussing his wages, so it has forfeited any argument on this appeal as to that finding. *See NLRB v. IBEW, Local 952*, 758 F.2d 436, 439–40 (9th Cir. 1985). Although in its pleadings below, NMFA briefly complained of the NLRB's findings that it promulgated overly broad and discriminatory directives and threatened Press, it did not meaningfully develop those arguments, let alone claim they were unsupported by substantial evidence, so they are similarly forfeited. *See In re Pena*, 974 F.3d 934, 940 n.3 (9th Cir. 2020). The NLRB is therefore entitled to summary enforcement of its first three findings.

All that remains is the NLRB's finding that NMFA discharged Press for engaging in actual or perceived concerted activities. To determine whether an employer violated Section 8(a)(1), we consider whether substantial evidence supports the Board's application of the *Wright Line* test. *See Wright Line*, 251 NLRB 1083 (1980). "Under *Wright Line*, the General Counsel must make a showing sufficient to support the inference that protected conduct was a motivating factor in the employer's decision." *United Nurses Ass'ns*, 871 F.3d at 778. The Board may then "infer a discriminatory motive from direct or circumstantial evidence." *Id.* If the Board finds that an employer had an unlawful motive, then the burden shifts to the employer to demonstrate that "it would have taken the challenged action even in the absence of the protected activity." *Healthcare Emps. Union v. NLRB*, 463 F.3d 909, 923 (9th Cir. 2006). "An employer cannot prove this affirmative defense where its asserted reasons for a discharge are found to be pretextual." *United Nurses Ass'ns*, 871 F.3d at 779.

At the outset, the parties dispute whether Press engaged in protected activity by discussing his compensation with other workers. For employee activity to be protected under the NLRA, it must be both concerted (*i.e.*, done with or on behalf of other employees) and done for mutual aid or protection (*i.e.*, done with the intention of improving the terms and conditions of their employment). *See NLRB v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 264–66 (9th Cir. 1995). Although we have not previously held that discussing compensation qualifies as protected activity, the NLRB has long recognized as much. *See, e.g.*, *Triana Industries, Inc.*, 245 NLRB No. 161, at *1 (1979) (explaining that the NLRA "encompasses the right of employees to ascertain what wage rates are paid by their employer" because "wages are a vital

term and condition of employment"); *see also Eastex, Inc. v. NLRB*, 437 U.S. 556, 569 (1978) ("Few topics are of such immediate concern to employees as the level of their wages."). We agree with the NLRB. Here, Press spoke with other employees about his compensation in response to the challenging working conditions they all faced, and—based on Matteson's references to a "crisis situation," a "hornets' nest," and "damage control"—those discussions appear to have sparked conversation among other workers about their own compensation. So it seems apparent both that discussing compensation qualifies as a protected activity and that the NLRB's determination that Press was engaged in such activity was supported by substantial evidence.

The NLRB's subsequent finding that NMFA was aware of that activity and that the conduct served as a motivating factor in NMFA's decision to terminate Press was also supported by substantial evidence. On Press's third day at the Complex, Matteson told Press that his decision to discuss his compensation with the other workers was "making [her] life really tough" and was "just this red-hot issue." When Press stated that he was "very sorry" that the other workers knew how much he was being paid, Matteson responded "[s]o am I." Finally, Matteson told Press that his discussions with the other workers about his compensation had "not built camaraderie at all," and Soto emphasized that these discussions had "backfired, really bad." In light of Matteson's statements in that meeting, the ALJ had a substantial basis to conclude that Press's protected activity played a meaningful role in NMFA's decision to discharge him the following day.

The burden therefore shifts to NMFA to demonstrate that it would have discharged Press when it did regardless of his protected activity. NMFA argues that the discharge decision

was based on Press's work performance and that it had similarly discharged other workers shortly after their first day because they were unable to complete work projects. However, neither Matteson nor Soto raised the issue of Press's work performance during their closed-door meeting with him the day before he was discharged. Instead, Matteson and Soto repeatedly referenced and expressed frustration about Press's compensation-related discussions with the other workers. Moreover, NMFA's claim that it has discharged other new hires under similar conditions is based on vague and conclusory testimony by Gareau, Mims, and Scott, only one of whom, Mims, provided the name (and only the first name) of a new hire who had been so discharged.

Under these circumstances, the NLRB's finding that NMFA violated Section 8(a)(1) by discharging Press for engaging in actual or perceived protected activities was supported by substantial evidence. Accordingly, we grant NMFA's application for enforcement.

\*      \*      \*

For the reasons stated above, the NLRB's application for enforcement of its order dated February 21, 2024 is **GRANTED**.